USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/29/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

MYPLAYCITY, INC.,

                Plaintiff,

                                            10 Civ. 1615 (CM)

   -against-

CONDUIT LIMITED,

                Defendant.

------------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

McMahon, J.

Presently before the Court are two motions filed by Defendant Conduit Limited ("Conduit"). Conduit filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) and a motion for partial summary judgment pursuant to Rule 56. Conduit argues that it is entitled to summary judgment on the issue of whether the contractual limitation of liability provision in the parties' agreement caps its liability at $5,000. Conduit also argues that MPC's intellectual property claims in Counts Three, Four, Five, and Seven are barred by the parties' agreement.

For the reasons that follow, Conduit's motion for partial summary judgment is granted. However, Conduit's motion for judgment on the pleadings is denied.

### I. BACKGROUND

Conduit Limited ("Conduit") is an internet company that licenses to providers of internet content or "publishers" the right to use its online platform to create and distribute customized "toolbars." Customers can install the toolbars as an add-on to their internet web browser.

1

MyPlayCity, Inc. ("MPC") is an internet company that creates, develops, and distributes computer software, including video games. (Second Am. Compl. ("SAC Compl.") ¶¶ 2, 6.)

Conduit's online platform allows publishers, such as MPC, to create a toolbar with customized features, including search engines, web gadgets, and alert boxes. (See Decl. of Noam Blidstein ("Blidstein Decl.") Ex. A, § 1.) The toolbars are made available to the public for download via a link on Conduit's or the publisher's websites. (Id.) When an internet user downloads a toolbar, it is installed in that user's web browser and allows the user to access content provided by the publisher, including the publisher's trademark. (Id.)

Conduit makes money each time a toolbar is used by a customer. For instance, if a person uses the search-box component of a Conduit toolbar to perform a Google search and subsequently clicks on an advertisement displayed by Google during the search, Conduit is entitled to a fee from Google. Conduit and publishers enter into agreements to share revenue from the toolbar.

MPC created its own toolbar (the "MPC toolbar") using Conduit's platform. In 2008, MPC and Conduit entered into two revenue share agreements outlining the sharing of revenue from the MPC toolbars. The parties entered into the first Revenue Share Agreement on January 31, 2008. (SAC Compl. ¶ 12.) In the agreement, MPC authorized Conduit to use the MPC trademark and software in connection with the toolbar and in return MPC was entitled to 50% of the revenue from the MPC toolbar. (Id.)

The parties entered into a second Revenue Share Agreement on March 11, 2008. (Id. ¶ 13.) That agreement provided for the creation of a second MPC toolbar. The March Revenue Share Agreement allowed Conduit to distribute the MPC toolbars and in exchange MPC received

50% of the revenue from the distribution and marketing of the MPC toolbars. (Id.) On January 7, 2009, the parties increased MPC's percentage of revenues under the Revenue Share Agreements from 50% to 75%. (Id. ¶ 14.) On February 6, 2009, MPC's share of the revenue under the Revenue Share Agreements again increased to 85%. (Id. ¶ 15.)

Pursuant to both Revenue Share Agreements, the MPC toolbars were available for download through Conduit's website. (Id. ¶ 16.) After downloading and installing the toolbars, internet users gain unlimited access to MPC's products. (Id.)

On September 16, 2009, Conduit sent MPC a "Notice of Termination," purporting to terminate both Revenue Share Agreements. (Id. ¶ 18.) Pursuant to the Notice, the Revenue Share Agreements were to terminate on October 15, 2009. (Id. ¶ 19.) MPC disputes the validity of the termination notice because it was addressed and sent to a third party (and not MPC). (Id. ¶ 20.) MPC does concede that it received the termination notice, but argues that the notice was inadequate and therefore not effective to terminate the Revenue Share Agreements. (Id. ¶¶ 18-21.)

Despite allegedly having terminated the Revenue Share Agreements, Conduit continued to distribute and grant internet users access to the MPC toolbars and MPC products for another eight months, until June 12, 2010. (Id. ¶ 22.) Because of Conduit's continued distribution of the MPC toolbars after termination of the Revenue Share Agreements, MPC now asserts various trademark and copyright infringement claims against Conduit. (See SAC Compl. Counts Three, Four, Five, & Seven.) MPC also alleges that Conduit continued to distribute the MPC toolbars after October 15, 2009 until June 12, 2010, but did not give MPC its share of the revenue from this period. (Id. ¶ 22.)

MPC commenced this action on March 1, 2010, and filed an Amended Complaint on March 17, 2010. On January 6, 2011, MPC filed a Second Amended Complaint, asserting seven causes of action against Conduit. Counts One and Two assert breach-of-contract and unjust-enrichment claims, respectively. Count Three alleges a violation of 15 U.S.C. § 1114 for Conduit's use of MPC's trademark in the MPC toolbars after the termination of the Revenue Share Agreements. Count Four asserts an unfair competition claim under 15 U.S.C. § 1125(a). Count Five asserts a state-law unfair competition and misappropriation claim against Conduit. Count Six alleges violations of New York General Business Law §§ 349 and 350. Finally, Count Seven asserts a copyright infringement claim, alleging that Conduit distributed copies of MPC's copyrighted software (via the MPC toolbars) after the Revenue Share Agreement was terminated and thus without MPC's authorization.

## II. DISCUSSION

### CONDUIT'S MOTION FOR JUDGMENT ON THE PLEADINGS

The standard for granting a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is identical to that of a Rule 12(b)(6) motion for failure to state a claim." Patel v. Contemporary Classics of Beverley Hills, 259 F.3d 123, 126 (2d Cir. 2001); see also Irish Lesbian & Gay Org. v. Giuliani, 143 F.3d 638, 644 (2d Cir. 1998). "In both postures, the district court must accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." Id. A Rule 12(c) motion should not be granted unless the Court is "satisfied that the complaint cannot state any set of facts that would entitle [the plaintiff] to relief." Id.

To survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949

(2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." Twombly, 550 U.S. at 570; Iqbal, 129 S. Ct. at 1950-51.

Finally, in deciding a motion to dismiss, the Court may consider the full text of documents that are quoted in or attached to the Complaint, or documents that the plaintiff either possessed or knew about and relied upon in bringing the suit. Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000) (citing Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42 (2d Cir. 1991)); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).

### A. Conduit's Motion for Judgment on the Pleadings is Denied

Conduit argues that MPC's intellectual property claims in Counts Three, Four, Five, and Seven should be dismissed. To support its argument, Conduit relies on language in the parties' agreement that, according to Conduit, bars MPC from bringing an intellectual property claim based on Conduit's distribution of the MPC toolbars.

The first Revenue Share Agreement, dated January 31, 2008, and the second Revenue Share Agreement, dated March 11, 2008, incorporate Conduit's standard "Publisher Agreement" that all publishers, including MPC, are bound by when using Conduit's online platform to create a toolbar. The Revenue Share Agreements provide the following:

> This Agreement supplements and does not replace the Publisher Agreement
> between Conduit and Publisher (the "Publisher Agreement") and the terms of the

5

> Publisher Agreement will apply to this Agreement except as specifically provided herein. Publisher hereby declares that by executing this agreement Publisher acknowledges having read and agreed to the terms of the Publisher Agreement as published at hhtp://www.conduit.com.

(Decl. of Eli Schulman ("Schulman Decl.") Ex. A and Ex. B.)

Section IV of the Publisher Agreement, entitled "Grant of License," states,

> PUBLISHER acknowledges that all right, title and interest in the Toolbar (excluding Publisher Materials), Environment and related CONDUIT technology are exclusively owned by CONDUIT and/or its authorized licensors, and that no right other than the limited license granted herein is provided to PUBLISHER. PUBLISHER shall not assert copyright, trademark or other intellectual property ownership or other proprietary rights in the Toolbar, CONDUIT technology, or in any element, derivation, adaptation, variation or name thereof.

(Blidstein Decl. Ex. A at § IV.) "Publisher Materials" is defined in the Publisher Agreement as

> logos, marks, links, images, texts, applications, and any other content which is added by PUBLISHER to the Toolbar and/or the Hosted Pages, content on PUBLISHER website, and/or the technology used by PUBLISHER in connection with his website or Toolbar (other than trademarks, trade names, content, service marks or logos owned or licensed by CONDUIT).

(Blidstein Decl. Ex. A at § I.) The term "Publisher" in the Publisher Agreement refers to MPC.

Conduit argues that Section IV of the Publisher Agreement bars MPC's copyright and trademark claims. To support its argument, Conduit relies on the second sentence of the paragraph: "Publisher shall not assert copyright, trademark or other intellectual property ownership or other proprietary rights in the Toolbar, Conduit technology, or in any element, derivation, adaptation, variation or name thereof." (Blidstein Decl. Ex. A at § IV.) Read alone, the sentence appears to support Conduit's argument.

However, the second sentence must be interpreted in light of the entire paragraph. The first sentence in the paragraph limits MPC's intellectual property rights: the Publisher Agreement grants MPC only a "limited license" in the "Toolbar, Environment and related Conduit technology." Specifically excluded from the first sentence—and therefore excluded

6

from the limitation on MPC's intellectual property rights—are "Publisher Materials." "Publisher Materials," according to the Publisher Agreement, include MPC's trademarks and copyrighted software. (Blidstein Decl. Ex. A at § I.) If MPC cannot assert a copyright or trademark infringement claim based on the unauthorized use of its "Publisher Materials," then the carve out in the first sentence is meaningless.

It is a basic tenet of contract law that, "In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable." Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd., 230 F.3d 549, 558 (2d Cir. 2000) (citing Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 27 (2d Cir. 1988) and Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985)). "Effect should be given to all the contract terms and the specific controls the general." Federal Ins. Co. v. Great White Fleet (US) Ltd., 2008 WL 2980029, at *5 (S.D.N.Y. Aug. 1, 2008). Conduit's interpretation renders the exclusion for Publisher Materials in the first sentence worthless, because it is Conduit's argument that MPC can never assert an intellectual property claim based on the unauthorized use of its own intellectual property. But the plain meaning of Section IV of the Publisher Agreement does not preclude MPC's intellectual property claims based on its own "Publisher Materials." See, e.g., Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010). The real issue is whether the allegedly infringing material falls within the definition of "Publisher Materials," but that creates an issue of fact.

Accordingly, Conduit's motion for judgment on the pleadings dismissing Counts Three, Four, Five, and Seven is denied.

## CONDUIT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On February 23, 2011, Conduit filed a motion for partial summary judgment based on the "Limitation of Liability" provision in the Publisher Agreement. Based on that provision, Conduit argues that MPC's potential recovery is capped at $5,000. Conduit argues that this limitation on liability applies to all of MPC's claims collectively—not $5,000 per claim. It urges that the Court dismiss MPC's suit if Conduit pays MPC the $5,000.

New York law governs the construction of the Publisher Agreement. (See Blidstein Decl. Ex. B at XII.)

Under New York law, "the key inquiry at the initial stage of interpreting a contract is whether it is ambiguous with respect to the issue disputed by the parties." Bank of New York v. First Millennium, Inc., 607 F.3d 905, 914 (2d Cir. 2010). "The matter of whether the contract is ambiguous is a question of law for the court." Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010).

"In determining a motion for summary judgment involving the construction of contractual language, a court should accord that language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006). "An ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275 (2d Cir. 2000) (internal quotation marks omitted). "The mere assertion of an ambiguity does not suffice to make an issue of fact." Palmieri, 445 F.3d at 187. "Only where the language

8

is unambiguous may the district court construe it as a matter of law and grant summary judgment accordingly." Id.; see also Bank of New York, 607 F.3d at 914.

The Publisher Agreement has a "Limitation of Liability" clause:

> Conduit and its Licensors will not be liable for any lost profits or costs of procurement of substitute goods or services, or for any indirect, special, incidental or consequential damages, including damages for lost data, however caused and under any theory of liability, including but not limited to contract, product liability, strict liability and negligence, and whether or not Conduit was or should have been aware or advised of the possibility of such damage. In no event will Conduit's and its Licensors' aggregate liability arising out of or related to this agreement, the use of or inability to use the Toolbar and/or Environment, to the fullest extent possible under applicable law, exceed $5,000. Some jurisdictions do not allow the exclusion or limitation of incidental or consequential damages, so the above limitations and exclusions may not apply to Publisher.

(Blidstein Decl. Ex. B at § VIII.)

Conduit focuses on the second sentence in arguing that its aggregate liability is limited to $5,000. MPC argues that the second sentence limits Conduit's aggregate liability only for the types of damages specified in the first sentence—that is, only as to incidental, indirect, special, or consequential damages.

"Where a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." Ruttenberg v. Davidge Data Sys. Corp., 626 N.Y.S.2d 174, 175 (N.Y. App. Div. 1995). "Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact." Id. at 176 (quoting Federal Deposit Ins. Corp. v. Herald Square Fabrics Corp., 439 N.Y.S.2d 944 (N.Y. App. Div. 1981)). The Limitation of Liability provision in the Publisher Agreement unambiguously limits Conduit's liability for all types of damages to $5,000.

The first sentence lists the types of damages for which Conduit cannot be held liable at all: lost profits, costs of procuring substitute goods or services, indirect damages, special damages, incidental damages, consequential damages, and damages for lost data. Conduit's liability for any such damages is nothing, regardless of the theory of liability. The second sentence sets a $5,000 limit on Conduit's "aggregate liability arising out of or related to this agreement." (Blidstein Decl. Ex. B at § VIII.) If, as MPC argues, the second sentence refers only to the damages enumerated in the first sentence, then the first sentence—which limits Conduit's liability for certain types of damages to zero—is superfluous. A contract should not be interpreted so as to render a clause superfluous or meaningless. Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992).

Additionally, MPC's reading of the limitations provision is nonsensical, as it would require the Court to conclude that Conduit's liability for the categories of damages listed in the first sentence is simultaneously limited to zero and $5,000. In construing a contract, "An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation." Ruttenberg, 626 N.Y.S.2d at 177. To give the first and second sentence effect and not render one sentence meaningless, the term "aggregate liability" in the second sentence cannot be coextensive with the categories of damages listed in the first sentence.

MPC argues that Conduit's alleged "wrongful conduct" means that the Limitation of Liability provision in the Publisher Agreement is unenforceable. But the Court may not, under the guise of contract interpretation, create a new contract for the parties. "[T]he courts will not indulge in artificial interpretations or abnormal implications in order to save a party from a bad bargain." 11 Richard A. Lord, Williston on Contracts, § 32:11 (4th ed. 1999). Regardless of the

10

merits of MPC's claims, it is not the Court's role to rewrite an unambiguous contract because it turned out poorly for one side. "A limitation on liability provision in a contract represents the parties' Agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 436 (N.Y. 1994).

Moreover, in New York, a contractual limitation of liability provision is enforceable "unless the party seeking to avoid liability has engaged in grossly negligent conduct evincing a 'reckless disregard for the rights of others.'" Pacnet Network Ltd. v. KDDI Corp., 912 N.Y.S.2d 178, 180-81 (N.Y. App. Div. 2010) (quoting Colnaghi, U.S.A. v. Jewelers Prot. Servs., 81 N.Y.2d 821, 823-824 (N.Y. 1993)). "[A]n exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing." Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 385 (N.Y. 1983). The conduct may be either "fraudulent, malicious or prompted by the sinister intention of one acting in bad faith." Id. "Even given restrictions on enforcing an exculpatory clause New York Courts set the bar quite high in placing misconduct within the exceptions, 'demanding nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice, recklessness, deliberate or callous indifference to the rights of others, or an extensive pattern of wanton acts." Deutsche Lufthansa AG v. The Boeing Co., 2007 WL 403301, at *3 (S.D.N.Y. Feb. 2, 2007).

MPC claims that Conduit secretly and deliberately manipulated revenue data from search engines used to calculate payments owed by Conduit to MPC pursuant to the parties' agreement. MPC cites to the deposition testimony of Conduit employee, Amir Nahmias, to support its argument. (See Declaration of Kevin R. Garden ("Garden Decl.") ¶¶ 4-10.) MPC argues that

Conduit reduced the actual total revenues generated by the MPC toolbars before paying MPC its share of the revenue. (Id. ¶ 5.)

Nahmias' testimony, however, does not support MPC's argument that Conduit "secretly implemented a program under which [it] skimmed 10% [off] the top of all revenues it received." (See MPC's Opp'n Br. at 19.) Nahmias testified that Conduit adjusted search figures provided by Google in order to benefit MPC. (Garden Decl. Ex. C. at 57-62.) MPC's payments under the agreement were calculated based on the number of "valid" searches generated by the toolbar. (Id. at Ex. C. at 49-54.) Therefore, the number of "non-valid" searches negatively impacted the revenue generated by the toolbar, because MPC was not paid for a "non-valid" search. (Id.) Even though Google provided Conduit with an estimate of the searches that were "non-valid," Conduit nonetheless used a smaller estimate than the one Google provided. (Id. at Ex. C. at 57-62.) For instance, if Google estimated that 10% of the searches from the toolbar were "non-valid," Conduit used a smaller percentage (*i.e.*, 8%) to reduce the total number of searches and therefore count more searches as "valid." (Id. at Ex. C at 57:19-25.) Because Conduit attributed a larger number of "valid" searches to a publisher's toolbar, the publisher benefited by receiving more revenue from the toolbar. (Id.)

Although it is true that Conduit did not disclose this practice to MPC, the practice benefited MPC and is therefore not the type of misconduct that would prevent the Court from enforcing the Limitation of Liability provision in the Publisher Agreement. Indeed, Nahmias testified that Conduit's "screening" practice, as it was called, never resulted in Conduit paying less money to MPC—rather, "[Conduit] actually paid more." (Id. at Ex. C at 56:24-57:2.)

When a contract is between two sophisticated parties "the conduct must evince a reckless disregard for the rights of others, or be of a kind that smacks of intentional wrongdoing" for a

court to conclude that a limitation of liability provision is unenforceable. Industrial Risk Insurers v. Port Authority of N.Y. and N.J., 387 F.Supp.2d 299, 305 (S.D.N.Y. 2005) (internal citations omitted). MPC has not adduced evidence that Conduit's conduct was sufficiently egregious to make the Limitation of Liability provision in the Publisher Agreement unenforceable.

The Publisher Agreement unambiguously limits Conduit's liability for certain enumerated types of damages to zero and for all other types of damages to $5,000. Conduit's motion for partial summary judgment is granted.

### III. CONCLUSION

For the reasons discussed, Conduit Limited's motion for judgment on the pleadings is denied. Conduit Limited's motion for partial summary judgment is granted.

The Clerk is instructed to remove docket entries 48 and 54 from the Court's list of pending motions.

Dated: July 29, 2011

_____
U.S.D.J.

BY EFC TO ALL COUNSEL